**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

v.

VICENTE RUIZ-GAXIOLA, AKA
Inocente G. Ruiz,,
        *Defendant-Appellant.*

No. 08-10378

D.C. No.
4:06-cr-01289-FRZ-
HCE

OPINION

Appeal from the United States District Court
for the District of Arizona
Frank R. Zapata, District Judge, Presiding

Argued and Submitted
August 31, 2009—Pasadena, California

Filed September 24, 2010

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Circuit Judge, and Robert J. Timlin,* District Judge.

Opinion by Judge Reinhardt

---

*The Honorable Robert J. Timlin, United States District Judge for the
Central District of California, sitting by designation.

**COUNSEL**

Deirdre M. Mokos (argued), Saul M. Huerta, Jr., Assistant Federal Public Defenders, Tucson, Arizona, for the defendant-appellant.

G. Micah Schmidt (argued), Monte Cress Clausen, Assistant U.S. Attorneys, Tucson, Arizona, for the plaintiff-appellee.

---

**OPINION**

REINHARDT, Circuit Judge:

The government is allowed to medicate a defendant involuntarily for the purpose of rendering him competent to stand trial only in rare circumstances. The question is whether this case presents those rare circumstances. Our answer is that it does not.

On July 26, 2006, defendant Vicente Ruiz-Gaxiola was charged with illegal reentry in violation of 8 U.S.C. § 1326. He was subsequently diagnosed with Delusional Disorder, grandiose type, and was found incompetent to stand trial. An administrative hearing conducted pursuant to *Washington v. Harper*, 494 U.S. 210 (1990), resulted in a determination that Ruiz was not a danger to himself or others in the institutional context and that he did not suffer from a grave disability justifying involuntary medication. The government then sought a court order authorizing it to medicate Ruiz involuntarily for the sole purpose of restoring him to competency for trial. A court may not grant such a request unless the government shows (1) "that *important* governmental interests are at stake" in prosecuting the defendant for the charged offense; (2) "that involuntary medication will *significantly further* those concomitant state interests," *i.e.,* it is substantially likely to restore the defendant to competency and substantially

unlikely to cause side effects that would impair significantly his ability to assist in his defense at trial; (3) "that involuntary medication is *necessary* to further those interests," *i.e.,* there are no less intrusive treatments that are likely to achieve substantially the same results; and (4) "that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." *Sell v. United States*, 539 U.S. 166, 180-81 (2003). Orders authorizing involuntary medication pursuant to this standard are "disfavored." *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005).

After receiving evaluation reports and hearing testimony from experts for the government and the defense, the magistrate judge concluded that the government had proved each of the *Sell* requirements by clear and convincing evidence. The district court adopted the magistrate judge's findings of fact and conclusions of law in their entirety, and entered an order authorizing the government to administer antipsychotic medication forcibly, under the conditions set forth in the magistrate judge's Report and Recommendation. Ruiz now appeals that ruling. We have jurisdiction under the collateral-order exception to 28 U.S.C. § 1291. *Sell*, 539 U.S. at 177.

We conclude that the district court erred in finding that the *Sell* factors were met without affording the question the "thorough consideration and justification" and "especially careful scrutiny" required. *United States v. Williams*, 356 F.3d 1045, 1055 (9th Cir. 2004). Further, we hold that the district court clearly erred in finding that the government proved by clear and convincing evidence that the proposed regime of involuntary medication is substantially likely to restore Ruiz to competency, as required under the second *Sell* factor. We also conclude that the district court clearly erred in finding that the government proved by clear and convincing evidence that the proposed treatment is medically appropriate, as required under the fourth *Sell* factor. Our holding under either the sec-

ond or the fourth factor would be sufficient to require reversal. Accordingly, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Ruiz, a citizen of Mexico, has been in federal custody since his arrest on June 27, 2006. The government alleges that on or about that date, he illegally re-entered the United States after having been deported, in violation of 8 U.S.C. § 1326. He has an extensive criminal history that dates back to 1984 and consists primarily of drug-related offenses. If he were convicted of the offense with which he is currently charged, he would face a Sentencing Guidelines range of 100 to 125 months of imprisonment.

Shortly after his arrest, Ruiz's counsel moved for an evaluation of his competency to stand trial. He was diagnosed with Delusional Disorder, grandiose type,[1] an extremely rare mental illness that rendered him unable to understand the nature and consequences of the proceedings against him or to assist properly in his own defense. The magistrate judge thus found him incompetent to stand trial and ordered him committed to the custody of the Attorney General for evaluation of his potential for restoration to competency. Ruiz was transferred to the Federal Medical Center in Butner, North Carolina ("FMC-Butner").

The FMC-Butner staff members who evaluated Ruiz agreed with the initial diagnosis of Delusional Disorder, gran-

---

[1]The record reflects that, although there is a range of mental illnesses that may be broadly described as delusional disorders, the diagnosis of Delusional Disorder refers to a specific mental illness. The 2006 Merck Manual of Medicine describes Delusional Disorder as a distinct disorder "characterized by non-bizarre delusions (false beliefs) that persist for at least 1 [month], without other symptoms of schizophrenia." The Manual describes the disorder as uncommon, and with respect to the grandiose subtype, notes that "the patient believes he has a great talent or has made an important discovery."

diose type, and determined that he remained incompetent to stand trial. They encouraged him to take psychotropic medication, but he repeatedly refused to do so. In a written report (the "FMC-Butner Evaluation"), the evaluators requested a judicial order authorizing them to forcibly medicate Ruiz for the sole purpose of restoring him to competency for trial. The evaluators recognized that their request was subject to the requirements set forth in *Sell v. United States*, 539 U.S. 166 (2003). The FMC-Butner Evaluation set forth the evaluators' reasons for concluding that the *Sell* requirements were satisfied.

Due in part to our admonition that "*Sell* orders are disfavored" and that courts should therefore "explore other procedures . . . before considering involuntary medication orders under *Sell*," *Rivera-Guerrero*, 426 F.3d at 1137, the magistrate judge did not immediately hold a *Sell* hearing in response to the FMC-Butner evaluators' request. Instead, the court first ordered the government to conduct an administrative hearing pursuant to *Harper*, in order to evaluate whether involuntarily medicating Ruiz was justified on the alternative basis that his mental illness rendered him gravely disabled or dangerous to himself or others. 494 U.S. 210. The government held the *Harper* hearing and determined that Ruiz did not meet either of those criteria.

Having determined that involuntary medication was not justified on any basis other than to render Ruiz competent for trial, the magistrate judge held two hearings to address the *Sell* requirements. On March 6, 2008, the court held a short hearing to discuss the first *Sell* factor, the strength of the government's interest in prosecuting Ruiz, which the court described as a purely "legal matter." On March 14, 2008, the court held a more extensive hearing at which the parties presented evidence relevant to the remaining *Sell* factors: whether involuntary medication would be substantially likely to restore Ruiz to competency and substantially unlikely to cause side effects that would impair significantly his ability to assist

in his defense at trial; whether there were any less intrusive treatments that would be likely to achieve the same results; and whether involuntary medication was in his best medical interest in light of his medical condition. *See Sell*, 539 U.S. at 180-81. The hearing focused on those criteria in the context of the government's proposed use of a particular antipsychotic medication, Haldol Decanoate.[2]

Two of the co-authors of the FMC-Butner Evaluation testified as expert witnesses for the government at the *Sell* hearing.[3] At the time of the hearing, Dr. Mark Cheltenham had been a staff psychiatrist at FMC-Butner for 17 months. He graduated from medical school in 2002, completed his residency in 2006, and worked as a local physician for four months before beginning work at FMC-Butner in October 2006. He was not board certified in psychiatry. Dr. Cheltenham met with Ruiz four or five times, for a total of about three hours.

The government's other expert was Carlton Pyant, a forensic psychologist at FMC-Butner. He received a master's degree in psychology in 1984 and a Ph.D. in psychology in 1989. He worked for the Army for six years before beginning work for the Bureau of Prisons, where he had been employed for fifteen years prior to the *Sell* hearing. He met with Ruiz "at least seven" times. Because Pyant is not a medical doctor, the government relied primarily on Dr. Cheltenham's testimony regarding medical issues.

The defense expert was Dr. Robert Cloninger, a psychiatrist who graduated from medical school in 1970, completed his residency in 1973, and has been board certified in psychiatry since 1975. He is a professor of psychiatry and of genetics

---

[2]Throughout the record, the drug is also referred to as "Haldol," "Halodol," or "Haloperidol." These variations in name all refer to the same drug.

[3]The third co-author of the FMC-Butner Evaluation was a Predoctoral Psychology Intern. He did not testify at the *Sell* hearing.

and psychology at Washington University, where he has been on the faculty since 1973. He also has a psychiatry practice in which he treats patients for approximately 15 hours per week. He has published over 350 articles and 8 books about psychiatry and has served as the editor or associate editor of several journals. He met with Ruiz by video teleconference for two hours and ten minutes, and also reviewed a number of documents including Ruiz's initial competency report, the FMC-Butner Evaluation, and the *Harper* hearing report.

Although all of the experts agreed that Ruiz suffered from Delusional Disorder and remained incompetent to stand trial, the two sides disagreed as to whether he should be involuntarily medicated. Testifying for the government, Dr. Cheltenham opined that involuntary medication would be substantially likely to restore Ruiz to competency; that intolerable side effects would be unlikely to manifest themselves during the relatively brief time frame of the proposed treatment; that Ruiz's lack of cooperation and unwillingness to acknowledge his mental illness precluded the possibility of less intrusive treatments; and that the proposed treatment was medically appropriate. Testifying for the defense, Dr. Cloninger opined that involuntary medication would likely exacerbate rather than improve Ruiz's delusional thinking; that he would immediately face a risk of serious and potentially irreversible side effects; that a treatment approach focused on establishing a trusting therapeutic alliance would be a less intrusive means of restoring him to competency; and that the proposed treatment was not medically appropriate.

On June 3, 2008, the magistrate judge issued a Report and Recommendation in which he concluded that the government had met its burden of proving each of the *Sell* requirements by clear and convincing evidence. He recommended that the district court grant the government's request to medicate Ruiz involuntarily, subject to specified limitations on medication, dosage, and duration of treatment.

Ruiz filed objections with the district court, and requested a stay in the event of an adverse decision. On August 19, 2008, the district court issued an order denying Ruiz's objections and adopting the magistrate judge's findings of fact and conclusions of law in their entirety. The court authorized the government to medicate Ruiz involuntarily, under the conditions outlined in the magistrate judge's Report and Recommendation. The court stayed the involuntarily medication order for a period of thirty days so as to allow Ruiz to seek appellate review.

Ruiz submitted a timely Notice of Interlocutory Appeal of the district court's order. On September 17, 2008, we granted his emergency motion to stay that order pending the resolution of this appeal.

## DISCUSSION

"The Supreme Court has thrice recognized a liberty interest in freedom from unwanted antipsychotic drugs." *Williams*, 356 F.3d at 1053 (internal quotation marks omitted); *see Sell*, 539 U.S. 166; *Riggins v. Nevada*, 504 U.S. 127 (1992); *Harper*, 494 U.S. 210. Antipsychotic medications are designed to cause a personality change that, "if unwanted, interferes with a person's self-autonomy, and can impair his or her ability to function in particular contexts." *Williams*, 356 F.3d at 1054 (citing *Riggins*, 504 U.S. at 137). In addition to the intended changes in cognition and behavior, the drugs "can have serious, even fatal, side effects." *Id.* (quoting *Harper*, 494 U.S. at 229-30). Accordingly, the Court has "refus[ed] to permit involuntary medication except in highly-specific factual and medical circumstances." *Rivera-Guerrero*, 426 F.3d at 1136. Together, "*Harper*, *Riggins*, and *Sell* demonstrate the Court's reluctance to permit involuntary medication except in rare circumstances." *Id.* at 1138.

**[1]** As we stated earlier, under *Sell*, the government cannot involuntarily medicate a mentally ill defendant for the pur-

pose of rendering him competent to stand trial unless it proves (1) "that *important* governmental interests are at stake;" (2) "that involuntary medication will *significantly further* those concomitant state interests;" (3) "that involuntary medication is *necessary* to further those interests;" and (4) "that administration of the drugs is *medically appropriate*." *Sell*, 539 U.S. at 180-81. The *Sell* factors do not represent a balancing test, but a set of independent requirements, each of which must be found to be true before the forcible administration of psychotropic drugs may be considered constitutionally permissible. *See United States v. Hernandez-Vasquez*, 513 F.3d 908, 913 (9th Cir. 2008). Here, Ruiz contends that the government failed to prove *any* of the four *Sell* requirements, and that the district court's order authorizing involuntary medication must therefore be reversed.

## I.

**[2]** In order to address Ruiz's claim that the government did not meet the burden imposed by *Sell*, we must first determine what burden of proof the government was required to satisfy. The Supreme Court did not explicitly state the burden of proof applicable to the government's request for a *Sell* order, and our court has not previously addressed that issue. A review of the relevant case law, however, demonstrates that a preponderance of the evidence standard would provide inadequate protection for the important constitutional interests at stake.

The Supreme Court has repeatedly emphasized the importance of the liberty interests affected by an involuntary medication order. "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Harper*, 494 U.S. at 229. That interference is "particularly severe" in the case of involuntary medication with antipsychotic drugs. *Riggins*, 504 U.S. at 134. Because an individual "possesses a significant liberty interest in avoiding the unwanted administration of antipsy-

chotic drugs under the Due Process Clause of the Fourteenth Amendment," *Harper*, 494 U.S. at 221-22, the Court has demanded "a finding of overriding justification and a determination of medical appropriateness" before an involuntary medication order may be issued. *Riggins*, 504 U.S. at 135.

These significant liberty interests call for equally significant procedural safeguards. Because "an order compelling a person to take antipsychotic medication is an especially grave infringement of liberty," it requires "thorough consideration and justification" and "especially careful scrutiny," and must be based on "a medically-informed record." *Williams*, 356 F.3d at 1055-56. Applying those principles in *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1138 (9th Cir. 2005), we held that the district court abused its discretion in denying the defendant's request for a continuance of his *Sell* hearing. We reasoned that "[t]he importance of the defendant's liberty interest, the powerful and permanent effects of anti-psychotic medications, and the strong possibility that a defendant's trial will be adversely affected by the drug's side-effects all counsel in favor of ensuring that an involuntary medication order is issued only after both sides have had a fair opportunity to present their case and develop a complete and reliable record." *Rivera-Guerrero*, 426 F.3d at 1138. Those considerations also weigh in favor of requiring the government to satisfy a heightened evidentiary standard.

We have noted that "*Sell* inquiries are disfavored in part because the medical opinions required for a *Sell* order are more multi-faceted, and thus more subject to error, than those required for a *Harper* analysis." *Hernandez-Vasquez*, 513 F.3d at 915. Accordingly, although the Supreme Court rejected the contention that the "clear and convincing evidence" standard was required for *Harper* hearings conducted by medical professionals, *Harper*, 494 U.S. at 235, the "more error-prone analysis" involved in a *Sell* hearing conducted by judicial officers, *Hernandez-Vasquez*, 513 F.3d at 915, calls for a more stringent burden of proof.

**[3]** Because of the importance of the liberty interests implicated by a *Sell* order and the high risk of error, every circuit to address the issue has concluded that the government must bear the burden of proving the relevant facts by clear and convincing evidence. *See United States v. Bush*, 585 F.3d 806, 814 (4th Cir. 2009) ("A higher standard . . . minimizes the risk of erroneous decisions in this important context . . . . [We] conclude that the government must satisfy the *Sell* factors by clear and convincing evidence."); *United States v. Grape*, 549 F.3d 591, 598 (3d Cir. 2008) ("[A]ll courts of appeals addressing this issue have held that the Government bears the burden of proof on factual questions by clear and convincing evidence."); *United States v. Payne*, 539 F.3d 505, 508-09 (6th Cir. 2008) ("[T]he risk of error and possible harm involved in deciding whether to forcibly medicate for the purpose of restoring competency are so substantial as to require the government to prove its case by clear and convincing evidence." (internal quotation marks omitted)); *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005) ("[The] *Sell* factors [that] depend upon factual findings . . . ought to be proved by the government by clear and convincing evidence . . . . [because of] the vital constitutional liberty interest at stake . . . ." ); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004) ("[T]he relevant findings must be supported by clear and convincing evidence."). We agree with those other circuits and hold that the government has the burden of establishing the facts necessary to allow it to prevail as to each *Sell* factor by clear and convincing evidence.

The first *Sell* factor, the importance of the government's interest in prosecution, is primarily a legal question. In contrast, the remaining *Sell* factors require the trial court to resolve disputed issues by weighing expert testimony and evaluating other medical evidence, and thus involve questions that are primarily factual in nature. Accordingly, we "review the district court's determinations with regard to the first *Sell* factor *de novo*, and the remaining *Sell* factors for clear error."[4] *Hernandez-Vasquez*, 513 F.3d at 915-16.

---

[4]That the district court here adopted in full the findings of the magistrate judge does not alter this standard of review. "Findings of fact of a magis-

A trial court's factual finding "is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009) (en banc) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Again, this year we reiterated that well-established standard, stating once again that we find clear error only when we have "a definite and firm conviction that a mistake has been committed." *Rhoades v. Henry*, 596 F.3d 1170, 1177 (9th Cir. 2010) (citation and internal quotation marks omitted). After sixty years of judicial experience with that standard, it needs no further explication. We jurists know what it means.

## II.

Having established the appropriate burden of proof and acknowledged the appropriate standard of review, we turn now to the merits of Ruiz's claim and examine whether his case presents those "rare circumstances" in which forcible medication is appropriate. We must determine whether the district court erred in concluding that the government satisfied the first of the four requirements for an involuntary medication order under *Sell*, and whether the district court clearly erred in finding that the government proved the remaining requirements by clear and convincing evidence. In doing so, we will also examine whether the strict procedural safeguards applicable to so significant a deprivation of a defendant's liberty interest have been complied with.

## A.

**[4]** The first factor of the *Sell* test requires the government to establish "that *important* governmental interests are at

---

trate judge adopted by the district court are reviewed under the clearly erroneous standard." *Wildman v. Johnson*, 261 F.3d 832, 836 (9th Cir. 2001).

stake." *Sell*, 539 U.S. at 180. In its explanation of this requirement, the Supreme Court stated that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." *Id.* The Court also cautioned, however, that courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution" because "[s]pecial circumstances may lessen the importance of that interest." *Id.* For example, a defendant who refuses medication may be subject to a lengthy period of civil commitment, which would "diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime," and thereby lessen the need for prosecution. *Id.* Similarly, the government has a reduced interest in prosecuting a defendant who "has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed)." *Id.* (internal citation omitted).

**[5]** *Hernandez-Vasquez* held that "the likely guideline range is the appropriate starting point" in determining whether a defendant's crime is serious enough to satisfy the first prong of the *Sell* test.[5] *Hernandez-Vasquez*, 513 F.3d at 919. We reasoned that the guidelines calculation provides "the best available predictor of the length of a defendant's incarceration" and that, unlike the statutory maximum, it includes some consideration of "the specific circumstances of individual defendants." *Id.* We recognized that the likely sentencing guideline range is not "the only factor that should be considered," however, because "the sentencing guidelines do not reflect the full universe of relevant circumstances." *Id.*

---

[5]In *Hernandez-Vasquez*, we determined that the offense at issue in that case, illegal reentry in violation of 8 U.S.C. § 1326, may "at least under some circumstances . . . constitute a 'serious' crime sufficient to justify involuntary medication under *Sell*." 513 F.3d at 919. Accordingly, although *Hernandez-Vasquez* does not stand for the proposition that illegal reentry will *always* qualify as a "serious" crime for purposes of the *Sell* test, it forecloses Ruiz's argument that the offense can *never* so qualify.

**[6]** Applying the framework set forth in *Hernandez-Vasquez*, we begin by considering the guideline range applicable to Ruiz, which is 100 to 125 months, not taking into consideration possible adjustments and departures under the Guidelines. This potentially lengthy sentence, which results primarily from Ruiz's extensive criminal history, suggests that the government has an important interest in prosecuting him for the current offense. The fact that he was arrested for this offense less than 14 months after he was last released from incarceration supports that conclusion. *See Hernandez-Vasquez*, 513 F.3d at 919 (approving the district court's consideration of "the closeness in time of the prior offenses to the current prosecution" as a factor in the seriousness inquiry).

**[7]** We must also examine, however, whether the facts of Ruiz's case present any "[s]pecial circumstances [that] may lessen the importance" of the government's interest in prosecution. *Sell*, 539 U.S. at 180. Ruiz has been in federal custody since his arrest on June 27, 2006; thus, he has already been confined for more than 47 months. The long duration of Ruiz's current confinement, which would be credited towards any sentence ultimately imposed, weakens the government's interest in prosecution. *Id.* Another circumstance that would in some instances lessen the government's interest in prosecution is the possibility that the defendant's refusal to take medication voluntarily could result in "lengthy confinement in an institution for the mentally ill[, which] . . . would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* Because nothing in the record suggests that Ruiz is subject to civil commitment as a danger to himself or others, however, that possibility is very slight here, if indeed it exists at all.**⁶**

---

**⁶**The district court erroneously concluded that the record affirmatively establishes that Ruiz is not subject to civil commitment. It reached that conclusion on the basis that Ruiz was found non-dangerous at a *Harper* hearing. The result of the *Harper* hearing, however, establishes only that Ruiz does not pose a danger to himself or others *while confined* in the

**[8]** When the duration of his present confinement (47 months) is deducted from the applicable guidelines range (100 to 125 months), Ruiz remains subject to an additional 53 to 78 months of imprisonment. In light of that substantial period of additional confinement and the slim possibility of Ruiz's future civil commitment, we conclude that the government would ordinarily have an important interest in prosecuting Ruiz for the offense with which he is currently charged, and we would ordinarily hold that the district court did not err in determining that the government satisfied the first of the four *Sell* requirements by clear and convincing evidence.

**[9]** There is one other circumstance that we should consider before reaching a final conclusion on this point. It seems reasonable to conclude from the record that Ruiz was inclined to commit this offense at least in part by his mental condition, his Delusional Disorder, grandiose type. In some cases, that the offense was the result of a mental disorder of this type might well render it less important that the government prosecute the particular defendant. For example, it may be less important where, as here, the crime is neither against persons nor property.[7] It is also important, however, that Ruiz may, as

institutional context. *See United States v. Godinez-Ortiz*, 563 F.3d 1022, 1026 (9th Cir. 2009). The *Harper* hearing did not address whether Ruiz might pose a danger to himself or others *if released*, and therefore did not rule out the possibility that he will be subject to civil commitment in the future.

We note that we examine dangerousness here only as it relates to the possibility of future civil commitment, and not as a consideration that would provide direct and independent support for an involuntary medication order. As we cautioned in *Hernandez-Vasquez*, courts must "remain mindful of the Supreme Court's distinction between the purposes and requirements of involuntary medication to restore competency," on the one hand, "and involuntary medication to reduce dangerousness," on the other hand. 513 F.3d at 919. The two inquiries should not be permitted "to collapse into each other." *Id.*

[7]As we noted in *Hernandez-Vasquez*, the *Sell* test does not create any categorical rule precluding courts from determining that a defendant's

a result of his mental condition, repeat his offense if he continues to believe that God wants him to be in the United States, as he apparently thought when he last entered unlawfully. Whether prosecution of such an individual remains important under these circumstances is a question that we hesitate to answer now. We will assume, however, for purposes of Ruiz's case that his prosecution would serve an important governmental interest, notwithstanding that the principal cause of his conduct was his mental disorder, and thus that the district court did not err as a matter of law with respect to the first *Sell* factor.

## B.

**[10]** Under the second prong of the *Sell* test, the government must establish that "involuntary medication will *significantly further*" its interest in prosecuting the defendant for the charged offense. *Sell*, 539 U.S. at 181. This factor requires the government to prove two facts by clear and convincing evidence: first, "that administration of the drugs is substantially likely to render the defendant competent to stand trial"; and second, "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.*

**[11]** In his Report and Recommendation, the magistrate judge set forth the conflicting opinions of the parties' experts on both sub-prongs of this *Sell* requirement, then issued a very brief statement of his findings and conclusions:

> The Court finds by clear and convincing evidence that the medication regimen FMC-Butner proposes is

---

"non-property, non-violent" crime is a serious offense. 513 F.3d at 918. But neither does it preclude courts from considering the nature of the crime as one of many factors that may be relevant in a particular case. Rather, courts must "consider the facts of individual cases in evaluating the government's interest in prosecution." *Id.*

> *designed* to reduce Defendant's delusions, restore normal thought processes, improve cognitive functioning in the courtroom and enable Defendant to assist his attorney. *Consequently*, the medication is substantially likely to render Defendant competent to proceed to trial and substantially unlikely to produce side effects that would interfere with Defendant's ability to assist his attorney or that would be harmful to him.

(Emphasis added). The magistrate judge's reasoning is clearly flawed. It does not follow that because the use of a product is designed to accomplish an end, it does so. Nor does it follow that it is substantially likely that it will do so, let alone substantially unlikely that it will have unintended adverse effects. Because the second factor of the *Sell* test requires the government to show by clear and convincing evidence what it is substantially likely that the involuntary medication regimen *will do* (and what it is substantially likely that it will not do), the government cannot satisfy its burden by showing what the involuntary medication regimen is *designed to do*. Accordingly, the magistrate judge's stated reasoning does not adequately support his conclusion with regard to the second *Sell* factor.

Moreover, the magistrate judge failed to make *any* factual findings relevant to the second prong of the *Sell* test. There is a compelling need in cases such as this for the district court to make factual findings so that the defendant may be assured that the trial court has conducted the stringent review mandated in light of the substantial infringement on his liberty interests, and so that upon review the appellate court may determine whether the findings are supported by clear and convincing evidence. Here, several factual issues were both vigorously disputed by the parties and critically important in determining whether involuntary medication is substantially likely to restore Ruiz to competency to stand trial. Rather than resolve those disputes, the magistrate judge simply set forth

the testimony offered by each side and relied solely on the conclusion that we have quoted above.

The inadequate reasoning and complete absence of findings that we have just described demonstrate that the magistrate judge and the district court, in adopting the magistrate judge's report, failed to comply with the procedural safeguards that are required before a court may authorize the "especially grave infringement of liberty" represented by the unwanted administration of antipsychotic drugs. *Cf. Williams*, 356 F.3d at 1055. Ruiz was denied the "thorough consideration and justification" and "especially careful scrutiny" that he was due. *Id.*

[12] The district court's failure to comply with the necessary procedural safeguards would alone prevent us from upholding its involuntary medication order. Although in some instances we might remand to allow the court to remedy its failures, doing so here would be futile. There is no explanation that the court could provide on remand and no findings consistent with the record before us that would allow us to conclude that the government has met its burden under the second *Sell* factor by clear and convincing evidence.

The parties agree that Ruiz suffers from Delusional Disorder, that he does not believe that he is mentally ill, and that he has never been treated with antipsychotic medication in the past. They do not agree, however, whether forcible injections of Haldol are substantially likely to restore Ruiz to competency for trial. As we have noted, the principal factual issues relevant to this prong of the *Sell* test are vigorously disputed by the parties. Among the contested questions are 1) whether antipsychotic medication is the clinically accepted treatment for Delusional Disorder; and 2) whether a 2007 study conducted at FMC-Butner (the "Herbel Study") establishes that involuntary medication is successful in restoring detainees with Delusional Disorder to competency.

With regard to the first contested question, the government evaluators opined in the FMC-Butner Evaluation that "antipsychotic medication is the accepted and appropriate treatment for an individual with the diagnosis of Delusional Disorder, Grandiose Type." Defense expert Cloninger opined that this statement was entirely inaccurate, and that in fact, there is no clinical consensus as to whether Delusional Disorder should be treated with antipsychotic medication.

The government evaluators' statement regarding antipsychotic medication as the standard treatment for Delusional Disorder conflicts with the information set forth in the 2006 Merck Manual of Medicine, the only medical reference text introduced into evidence, a text identified by the defense, without contradiction, as the medical equivalent of Black's Law Dictionary. According to the Merck Manual, treatment for Delusional Disorder "aims to establish an effective physician-patient relationship and to manage complications." The manual states that "[i]nsufficient data is available to support the use of any particular drug [in treating Delusional Disorder], although antipsychotics *sometimes* suppress symptoms." (emphasis added). In contrast, the government evaluators simply stated in the FMC-Butner Evaluation, without reference to any published authority, that "the standard and accepted treatment for *anyone* with the diagnosis of Delusional Disorder would involve the prescription of antipsychotic medication." (Emphasis added).

**[13]** Similarly, government expert Cheltenham initially testified at the *Sell* hearing that he viewed antipsychotic medication as "the next step in [Ruiz's] treatment" because Delusional Disorder "is classified as a psychotic disorder, and the first line of treatment . . . for a psychotic illness is an antipsychotic medication." Subsequently, however, he was asked whether there was a "scientifically established consensus on how to treat Mr. Ruiz in a way which is likely to be beneficial." He responded that

there's not an explicit consensus. There's a paucity
of data . . . regarding the treatment of delusional dis-
order in terms of with medications . . . . And so no,
there is no explicit practice guideline or consensus
on — on how to treat patients with delusional disor-
der, and particularly as it regards medications.

In sum, the government's original claim that "antipsychotic
medication is the accepted and appropriate treatment for an
individual with the diagnosis of Delusional Disorder, Grandi-
ose Type," was thoroughly discredited by the defense and
ultimately abandoned by the government. Thus, the govern-
ment's initial contention that antipsychotic medication is the
clinically accepted treatment for Delusional Disorder is with-
out support in the record. Accordingly, it provides no support
for the government's assertion that the forced medication is
substantially likely to restore Ruiz to competency for trial.

With regard to the second contested question, the govern-
ment experts offered the Herbel Study as evidentiary support
for their opinion that involuntarily medicating Ruiz is sub-
stantially likely to restore him to competency. The Herbel
Study consisted of a retrospective review conducted in 2007
by Drs. Herbel and Stelmach, who examined the outcomes of
twenty-two patients diagnosed with Delusional Disorder and
treated with antipsychotic medication at the FMC-Butner
facility. Because the Herbel Study specifically addressed the
involuntary medication of incompetent, non-dangerous pre-
trial detainees with Delusional Disorder, Dr. Cheltenham
opined that it provided particularly relevant evidence as to the
probable outcome of involuntarily medicating Ruiz. He testi-
fied that the study documented a "77 percent restoration of
competency with antipsychotic treatment" for the twenty-two
patients whose outcomes were reviewed.

Defense expert Cloninger opined that as a retrospective
review without a randomized control group, the Herbel Study
lacked sufficient scientific validity to support any firm con-

clusions about the efficacy of involuntary medication in treating detainees with Delusional Disorder. Dr. Cloninger explained that "treatment studies that do not make comparisons with untreated controls can easily lead to the erroneous belief in the efficacy of whatever was done," and opined that the absence of a control group in the Herbel Study meant that it "actually d[id] not show that the use of the medications ha[d] a cause and effect relationship to the outcomes." He cited other studies that had shown similar rates of success *without* the use of antipsychotic medication.[8] He opined that the Herbel Study provided only "preliminary anecdotal support, which is not an adequate scientific basis for expert opinion."

Government expert Cheltenham agreed that retrospective reviews like the Herbel Study are generally biased in favor of finding that treatment produced favorable results. The Herbel Study itself acknowledged its structural limitations, noting that

> some patients may have been misdiagnosed and wrongly included or excluded from this study population. Standard research methods to reduce bias . . . were not possible in this study. Without these safeguards, *the opinions of the forensic examiners may have been biased in favor of finding a positive response to treatment.*

> . . . .

---

[8]Specifically, a study published in 2000 found that 63% of patients with Delusional Disorder improved with appropriate psychological support only, "whether or not they [were] administered antipsychotic medication." The study was referenced in Dr. Cloninger's evaluation report, which was made available to the government experts prior to the *Sell* hearing. When asked about the study at the *Sell* hearing, government expert Cheltenham testified that he was not familiar with it.

Despite the limitations of this study, the results provide mental health professionals *some evidence* that most of the incompetent male defendants with a diagnosis of delusional disorder, especially the persecution subtype, will respond favorably to involuntary treatment with standard doses of first- and second-generation antipsychotic medications. *Additional research is needed to confirm and expand on these findings.*

(Emphases added). By their own terms, the findings of the Herbel Study are both limited and tentative. Certainly, they do not constitute clear and convincing evidence that involuntarily medicating Ruiz, who is not even a "persecution subtype," is substantially likely to restore him to competency.

In addition to contending that the government experts' reliance on the Herbel Study was unwarranted, defense expert Cloninger opined that "involuntary treatment of Mr. Ruiz-Gaxiola with antipsychotic medication is likely to worsen his condition, not restore him to competency." Dr. Cloninger based that opinion on "the crucial role of inferiority feelings and hypersensitivity to powerlessness in the development of Delusional Disorder in general and in Mr. Ruiz-Gaxiola in particular." He testified that involuntary medication would "basically make [Ruiz] fight back," using his delusions to reduce his sense of powerlessness, "and he'll become more grandiose in proportion to how much he is forced to do things against his will."

The government experts disagreed, opining that the proposed regime of involuntary medication would reduce rather than increase Ruiz's delusional thinking. In support of that opinion, the government experts primarily relied on the effects of antipsychotic medication on delusional thought processes generally, rather than evidence specific to the particular mental illness from which Ruiz suffers.[9] The FMC-Butner

---

[9]The exceptions, which we have already discussed, are the government's discredited and abandoned position that antipsychotic medication

Evaluation noted that because Ruiz had never been treated with antipsychotic medication, "there is no established pattern of treatment response to review and upon which to base the probability of his current response to medication." Instead, the government evaluators supported their assertions regarding Ruiz's likely response to the government's proposed treatment by reference to "general observations . . . regarding treatment response to antipsychotic medications," including statistics published by the American Psychiatric Association (APA) about the efficacy of antipsychotic medications in treating patients with Schizophrenia.[10] During the *Sell* hearing, however, government expert Cheltenham acknowledged that Delusional Disorder and Schizophrenia are "distinct disorders." He conceded that the FMC-Butner Evaluation provided data for Schizophrenia, rather than Delusional Disorder, because there was no known treatment for Delusional Disorder that had been validated in randomized clinical trials.

In addition to asserting the general proposition that antipsychotic medication tends to reduce delusional thinking, Dr. Cheltenham testified that he had treated two patients with Delusional Disorder at a clinic outside of the prison system for three months, and both patients "had improvement with antipsychotic medication." The voluntary nature of that treatment, however, distinguishes it from the involuntary treatment that Dr. Cloninger testified would trigger an increase in Ruiz's delusional thinking as a means of asserting control. Moreover, Dr. Cheltenham admitted that he had never "treated a patient with delusional disorder with antipsychotic medication" within the federal prison system.

---

is the clinically accepted treatment for Delusional Disorder and its reliance on the small-scale and structurally limited Herbel Study.

[10]The FMC-Butner Evaluation noted that "[r]esponse to antipsychotic medication is highly individual," and explained that "[b]ecause it is difficult to predict an individual's response to antipsychotic medication, [the APA statistics] have been provided to indicate the likelihood of response if an individual is treated with an antipsychotic medication."

The dispute over the factual issues described above notably parallels the government and defense witnesses' relative expertise and knowledge regarding Delusional Disorder and the response to treatment with antipsychotic medication of persons suffering from that "uncommon" and distinct disorder. *See supra* note 1. The expert reports and testimony demonstrate that Dr. Cloninger had a far superior knowledge base than the government's two "experts." At the time of the hearing, Dr. Cloninger had been board certified in psychiatry for more than 33 years and had published hundreds of books and articles on psychiatry, while the government psychiatrist, Dr. Cheltenham, was not yet board certified and had been practicing psychiatry for less than two years. Dr. Cloninger referred to multiple scientific studies supporting his views, and the government experts provided no explanation as to why those studies did not support his conclusions. When asked about one particularly relevant study, Dr. Cheltenham frankly acknowledged that he had not read it, even though it was referred to in a report that had been furnished to him.

In contrast to the multiple scientific studies that supported Dr. Cloninger's views, all of which were described in his evaluation report and none of which the government even attempted to discredit, the government's evaluation report cited only two studies and a "Practice Guideline," none of which had any apparent connection to Delusional Disorder and one of which was specifically limited to a different mental illness. The government experts' evaluation report also unquestionably misstated the existence of a scientific consensus for treating Delusional Disorder. In their testimony at the *Sell* hearing, the government experts attempted to provide scientific support for their position by citing the Herbel Study, but that study does not purport to be anything more than a small-scale and structurally limited retrospective review that, according to its authors, "may have been biased" and required "additional research" to confirm its findings. The weaknesses in the Herbel Study were readily admitted by the government experts when they were questioned about it by the defense. In

short, unlike Dr. Cloninger, the government experts did not base their opinion as to the substantial likelihood of involuntary medication restoring Ruiz to competency on the characteristics of his particular mental illness or on scientific data obtained through randomized clinical trials.

The government experts relied in large part on the general proposition that antipsychotic medication reduces mentally ill patients' delusional thought processes, and not on any specific studies or other information regarding persons suffering from the distinct disease of Delusional Disorder. From that general proposition, they drew the direct inference that the involuntary administration of antipsychotic medication would reduce Ruiz's delusional thought processes. This type of reasoning has very little value to courts conducting the *Sell* inquiry, as the Fourth Circuit has recognized:

> Instead of analyzing [the defendant] as an individual, the [government] report simply sets up syllogisms to explain its conclusions: (1) atypical antipsychotic medications are generally effective, . . . (2) [the defendant] will be given atypical antipsychotic medications, (3) therefore, atypical antipsychotic medication will be effective . . . for [the defendant]. To hold that this type of analysis satisfies *Sell*'s second . . . factor[ ] would be to find [that] the government necessarily meets its burden in every case it wishes to use atypical antipsychotic medication.

*United States v. Evans*, 404 F.3d 227, 241 (4th Cir. 2005). Like the Fourth Circuit, "[w]e do not believe that *Sell*'s analysis permits such deference." *Id.*

**[14]** In Ruiz's case, as in Evans's, the government experts rely on generalities and fail to apply their views to Ruiz's condition with specificity. They also have made multiple misstatements and introduced inadequate supporting authority.

This showing stands in stark contrast to the specific and well-supported testimony of the more-experienced and knowledgeable defense expert. We conclude that the generalized statements and unsupported assertions of the government experts, when contrasted with the specific and authoritative rebuttal evidence presented by the defense, were plainly insufficient to establish by clear and convincing evidence that the proposed regime of involuntary medication is substantially likely to restore Ruiz to competency.[11] The district court's contrary finding leaves us with "a definite and firm conviction that a mistake has been committed." Accordingly, we hold that the district court clearly erred in finding that the government proved the second *Sell* factor by clear and convincing evidence.[12]

---

[11]We note that other circuits have recognized the weakness of evidence that antipsychotic medication is successful in treating Delusional Disorder, and accordingly, have hesitated to approve *Sell* orders for detainees with this particular mental illness. *See United States v. Bush*, 585 F.3d 806, 817 (4th Cir. 2009) (vacating a *Sell* order for a detainee with Delusional Disorder and remanding for application of the appropriate burden of proof, in part because "all experts agreed that there is a dearth of medical evidence about the success of medicating persons suffering from Delusional Disorder, Persecutory Type"); *United States v. Ghane*, 392 F.3d 317, 319 (8th Cir. 2004) (reversing a *Sell* order for a detainee with Delusional Disorder, based in part on findings that the illness "resists treatment by . . . antipsychotic medication"). *But see United States v. Gomes*, 387 F.3d 157, 161-62 (2d Cir. 2004) (affirming a *Sell* order for a detainee with Delusional Disorder where the defense did not present any expert testimony and both government experts opined that involuntary medication was substantially likely to restore him to competency).

[12]In light of our conclusion that the district court clearly erred in finding that the government proved by clear and convincing evidence that involuntary medication is substantially likely to restore Ruiz to competency, we need not at this point review the district court's finding with regard to the other prong of the second *Sell* factor, which requires the government to prove by clear and convincing evidence that involuntary medication is substantially unlikely to have side effects that would render Ruiz's trial unfair.

## C.

**[15]** Under the third prong of the *Sell* test, the government must establish "that involuntary medication is *necessary* to further" its interest in prosecuting the defendant for the charged offense. *Sell*, 539 U.S. at 180-81. Of course, if a proposed treatment will not further the government's interest in prosecution, as required under the second *Sell* factor, it could not possibly provide a *necessary* means of doing so. This third factor thus assumes that the government has established the second factor, and it then requires it to prove by clear and convincing evidence "that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.* at 181.

Here, as we have explained, the district court clearly erred in finding that the government proved the second *Sell* factor by clear and convincing evidence. Had the government succeeded in establishing the second factor, however, the district court's finding as to the third factor would not be clearly erroneous.

Defense expert Cloninger opined that a therapeutic alliance with a private psychiatrist, unaffiliated with the prison system, would be less intrusive than involuntarily medicating Ruiz and would produce superior results. Dr. Cloninger explained that there was "clear and compelling scientific evidence" that establishing a therapeutic alliance was beneficial to patients with Ruiz's diagnosis and personality. In his Report and Recommendation, which the district judge adopted, the magistrate judge found that this "proposed alternative and less intrusive treatment [was] unlikely to achieve the same results as involuntarily administered antipsychotic medication." He offered several reasons for that conclusion.

First, the report rejected Dr. Cloninger's proposed alternative treatment because the "proposal [was] based on a two hour ten minute long video teleconference interview of

Defendant, unlike the Government's extended examinations and observations." (internal citations omitted). We find this aspect of the court's reasoning extremely troubling. Because defendants are routinely detained at federal medical centers prior to *Sell* hearings, it will almost always be the case that the government experts who work at the federal medical centers will have had the opportunity to spend more time with the defendant than a defense expert possibly could. If a court can reject the opinion of a defense expert based solely on the lengthier observation conducted by the government experts, it will always be possible for the government to prevail in a *Sell* hearing by having its experts spend a greater amount of time with the defendant. Such an approach would create an unjustifiable risk of erroneous results and deprive defendants of the vitally important protections that a *Sell* hearing is designed to provide.[13]

The report also found, however, that Ruiz "1) does not believe he is mentally ill; 2) does not believe he needs medication; 3) does not believe he needs treatment of any kind; . . . 4) is vested and fixed in his delusional ideation"; and 5) "harbors elaborate delusions that involve the correctional system generally, and his caretakers in particular, in conspiracies against him." The expert reports and testimony were substantially in agreement with regard to those findings. Moreover, government expert Cheltenham testified that the alternative treatment proposed by the defense could not be provided within the constraints of the prison environment, and defense expert Cloninger conceded that those constraints would present "a real challenge":

---

[13]In addition to our concern with this reasoning as a matter of legal principle, we note that it finds little to no support in the facts of this case. The government's principal expert witness testified that he met with Ruiz "four or five times," for a total of "probably three" hours. The government's other expert witness testified that he "was probably in at least seven sessions" with Ruiz, for a total of possibly three to four hours. This testimony fails to establish that either of the government experts spent a significantly longer amount of time with Ruiz than did the defense expert.

> [T]he reason that I think this is especially problem-
> atic in a prison setting is that the forensic evaluators
> do not regard themselves as having a doctor/patient
> relationship . . . . . [T]hey are agents of the Court, not
> his advocates, and he picks up on that. And he sees
> that, you know, they're not there for me; they're
> there for the Court, and he feels some adversarial
> relationship between the Court that's charging him
> with a crime and himself.
>
> . . . . And so, I think it's very hard to treat him with
> the current justice system the way it's set up . . . .
> [W]hen I really try to think about how could we do
> this the way things are done now, I think it's very
> hard for the doctors at [the federal medical center]
> . . . . [I]t really is a dilemma in our current situation.

Based on this evidence, the court could reasonably conclude
that aspects of Ruiz's condition identified by the expert wit-
nesses, especially his resistance to treatment and his conspira-
torial delusions, made it unlikely that he would engage in the
voluntary therapy proposed by the defense while confined
within the federal prison system. Accordingly, the court did
not clearly err in finding that the government proved by clear
and convincing evidence that less intrusive treatments would
be unlikely to restore Ruiz to competency for trial.

The third *Sell* factor also requires courts to "consider less
intrusive means for administering the drugs, *e.g.,* a court order
to the defendant backed by the contempt power, before con-
sidering more intrusive methods." *Sell*, 539 U.S. at 181. Here,
the district court's *Sell* order required the government "to
request of Defendant that he voluntarily take medication
orally before each and every scheduled administration of
medication by injection." This requirement would ensure that
forcible administration of the drugs would not occur, or would
not continue to occur, if Ruiz consented to taking the medica-
tion. Because there does not appear to be any other means of

reducing the intrusiveness of the medication process, this aspect of the order establishes that the court adequately considered less intrusive means of administering the drugs.

**[16]** Because the government failed to prove the second *Sell* factor, it could not possibly have proved the third factor. For the foregoing reasons, however, had the government proved the second factor by clear and convincing evidence, we would conclude that the court did not clearly err in finding that the third *Sell* factor was satisfied by clear and convincing evidence as well.

## D.

**[17]** Under the fourth and final prong of the *Sell* test, a court may authorize involuntary medication only if "administration of the drugs is *medically appropriate*." *Id*. This factor requires that the government prove by clear and convincing evidence that the proposed regime of involuntary medication is "in the *patient's* best medical interest in light of his medical condition." *Id.* (emphasis added).

The existence of factor four reflects the importance of the liberty interests at stake in an involuntary medication order: Even if forcible medication provides the only means of bringing an incompetent defendant to trial for a serious crime, and is substantially likely to restore him to competency without causing side effects that would render the trial unfair, the treatment is nonetheless impermissible unless it is *also* in the defendant's best medical interest. We find it noteworthy that the Court used the word "patient" in its explanation of this prong of the *Sell* test, rather than the word "defendant," which it used in its discussion of the other three factors. *Sell*, 539 U.S. at 180-81. The choice of words serves to emphasize that, in analyzing this factor, courts must consider the long-term medical interests of the individual rather than the short-term institutional interests of the justice system.

A proposed regime of involuntary medication will not ordinarily be medically appropriate unless it is, at the least, substantially likely to restore the defendant to competency, in conformity with *Sell* factor two. Certainly that is true under the facts of this case, and the magistrate judge explicitly based his finding of medical appropriateness on his conclusion that Ruiz was "restorable through monitored medication within a matter of months." Although the term "restorable" may be ambiguous, it is clear from the context that the magistrate judge meant "sufficiently restored to competency for the period of the trial so as to be able to assist counsel in conducting trial defense" and no more. The magistrate judge also recognized other issues relevant to the medical appropriateness inquiry, including the questions whether Ruiz would be "substantially harmed" by the medication or "experience long-term effects from the medication." He then stated that he had already addressed those questions in his analysis under factor two when he considered whether the proposed regime of involuntary medication was substantially unlikely to have side effects that would undermine the fairness of Ruiz's trial. On that basis, he incorporated the reasoning and conclusions of the section of the Report and Recommendation that addressed the second *Sell* factor in the section addressing the fourth *Sell* factor, and did not engage in any further discussion of the unlikelihood of the proposed treatment's side effects or the likelihood that the involuntary medication would restore Ruiz to competency.

In relying on the portion of his report that addressed the second *Sell* factor to satisfy the requirements of the fourth factor, the magistrate judge committed three serious errors. First, the conclusions that the magistrate judge reached with regard to the second *Sell* factor could not serve to inform his analysis of the fourth *Sell* factor because the former section of the report contained no findings, resolved none of the disputed factual questions, and rested its conclusion on flawed reasoning. It included only a restatement of the various contentions of the parties, followed immediately by the statement that

because the forced medication regime was *designed* to restore Ruiz to competency and to avoid side effects, it was "substantially likely to render Defendant competent to proceed to trial and substantially unlikely to produce side effects that would interfere with Defendant's ability to assist his attorney or that would be harmful to him." We have already explained that determining what a course of treatment is designed to do is not sufficient when a court is charged with the responsibility of determining what it actually does or is substantially likely to do. *See supra* Part II.B.

Second, as discussed *supra*, the magistrate judge also clearly erred in his consideration of the second factor by concluding that the government proved by clear and convincing evidence that the proposed regime of involuntary medication is substantially likely to restore Ruiz to competency. Because that erroneous conclusion was not only incorporated into the magistrate judge's analysis of the fourth factor, but formed an integral part of that analysis, his conclusion as to medical appropriateness was rendered erroneous as well.

Third, the magistrate judge apparently failed to appreciate that the scope of the inquiry with respect to the fourth *Sell* factor is far broader than with respect to the second *Sell* factor. The second prong of the *Sell* test requires courts to determine only whether the medication is "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with [his] ability to assist counsel in conducting trial defense." 539 U.S. at 181. In contrast, the fourth *Sell* factor requires the court to consider *all* of the medical consequences of the proposed involuntary medication, including those consequences that may not affect the defendant's trial in any way, but result in long term side effects.[14] It also requires the court,

---

[14]For example, if a proposed medication were known to cause side effects that did not become apparent until years after the medication was administered, those side effects would be relevant to the fourth prong of the *Sell* test but not to the second.

in making the decision, to consider the length of time the treatment regime must be continued in order to provide the desired medical benefit to the patient.

Even if the district court had not made the serious errors that we have just described, it would be clear error for the district court to find on the basis of the record before us that the government proved by clear and convincing evidence that the proposed regime of involuntary medication is medically appropriate for Ruiz, the patient, in light of his medical condition. No doctor would prescribe a medication regime unless the likelihood and value of its potential benefits outweighed the likelihood and severity of its potential harms over the course of the treatment, as opposed to during the period in which the government wishes to conduct a criminal trial. Here, the government unquestionably failed to prove by clear and convincing evidence that its proposed treatment satisfies this risk-benefit analysis over the relevant period.

**[18]** As we made clear earlier, there is no medical consensus that antipsychotic medication is the appropriate treatment for Delusional Disorder and very little evidence that it would be successful in reducing Ruiz's type of delusions. *See supra* Part II.B. Even if there were such evidence, however, indisputably the government did not make a clear and convincing showing of medical appropriateness over the course of the necessary treatment — Ruiz's lifetime. There is *no* evidence that the antipsychotic drug does more, at best, than control the symptoms of Delusional Disorder, and none that it cures the mental disorder from which Ruiz suffers. Moreover, the value of even controlling the symptoms of Delusional Disorder is unclear. Government expert Cheltenham testified that "patients with delusional disorder are generally high functioning unless you elicit a discussion regarding their delusion. Other than that, they function normally in society." The record also suggests that Ruiz, in particular, is not currently experiencing significant distress as a result of his condition. The FMC-Butner Evaluation stated that his "overall adjustment to the

institution has been appropriate" and that "no disciplinary charges have been filed against him," although there is probably some risk that his delusion that God wishes him to be in the United States may cause him to repeat his border crossing. When speaking with defense expert Cloninger, Ruiz described his mood as "happy" despite his confinement. Certainly, it is not medically appropriate to reduce Ruiz's delusions by involuntary medication for the period of the criminal trial if the delusions will resume upon its completion and, due to the medication, cause him to experience long-term side effects.

The need for lifelong treatment and the uncertainty of the medical benefit of the antipsychotic drug as a control device, even over the short run, must be viewed in light of the evidence regarding the very real risk associated with the use of the proposed medication. Both parties agreed that Haldol could cause serious side effects, most notably tardive dyskinesia, which government expert Cheltenham described as "a very disfiguring side effect that can affect muscles anywhere in the body." Dr. Cheltenham testified that tardive dyskinesia can be reversed "in up to 50 percent of the patients, if it's detected early." In other words, according to the evidence presented by the government, tardive dyskinesia is irreversible in at least fifty percent of those patients who experience it, even when it is detected early.

The government experts proposed to treat involuntarily by medication the symptoms of Ruiz's illness only during the period of his trial, including trial preparation, and asserted that over that three- or four-month period of time, the risk of tardive dyskinesia as a side effect would be very small. It is undisputed, however, that the medication will not have any effect after the conclusion of the three- or four-month period unless Ruiz continues to take it, and to do so for an indefinite period of time. From a patient's standpoint, the medical benefit of becoming competent to stand trial for only a few months (even if that outcome were likely) and then returning to his prior state of Delusional Disorder could not outweigh even a

miniscule risk of a disfiguring and potentially irreversible side effect. Because the proposed course of medication could be considered medically appropriate treatment only for those patients who expect or hope to continue undergoing it indefinitely (and clearly any patient who must be forced to take the antipsychotic medication involuntarily is not in that category), "the patient's best medical interest" cannot be measured, as the district court and the government did, by evaluating the benefit and risk over the period of the trial only. There is no medical value to a medication regime that alleviates the mental disorder, if it does so at all, only for the short period of time necessary for trial preparation and the trial itself, while creating a risk of side-effects that would render the regime inappropriate for a patient's long-term treatment. If the involuntary antipsychotic medication is to be administered for so short a period, it is clearly not in "the patient's best medical interest" to risk serious medical consequences for a benefit that, if one results at all, is only a temporary alleviation of the symptoms and not a long-term remedy for the mental illness.

Because a medical justification for an involuntary regime of Haldol treatment would be conceivable only if the antipsychotic medication were to be taken on a long-term basis, the issue would become whether the likelihood and value of the long-term benefits outweigh the likelihood and severity of the long-term harms. With regard to the latter, government expert Cheltenham testified that the medication carries a twenty percent "lifetime prevalence or lifetime risk" of tardive dyskinesia. Even disregarding the testimony of the more-experienced defense psychiatrist that the administration of Haldol would be counter-productive in any event, the government did not prove by clear and convincing evidence that a Haldol regime would be in the patient's best medical interest in light of his medical condition, because it introduced no evidence that the purported lifetime benefits to Ruiz would make the proposed treatment medically appropriate in spite of the significant lifetime risk.[15] *In fact, the government offered no evidence at all*

---

[15]If anything, the government expert's testimony that people with Delusional Disorder tend to lead relatively normal lives, and thus gain a relatively limited benefit from treatment, supports the opposite conclusion.

*as to whether the Haldol treatment would render Ruiz competent or have any positive effect at all on his Delusional Disorder at any time after the three or four months during which the trial preparations and the trial itself would be conducted.*

**[19]** For the above reasons, the government failed to establish by clear and convincing evidence that the proposed treatment regime of involuntary medication is medically appropriate in light of Ruiz's medical condition, and the district court clearly erred in finding that it did. Thus, we are compelled to reverse not only because of the government's failure to meet the requirements of *Sell* factor two, but also because of its failure to do so with respect to factor four.

## Conclusion

Ruiz suffers from a mental disorder that is extremely rare and difficult to treat. The government proposes to administer antipsychotic medication involuntarily to Ruiz in order to further its interest in prosecuting him for a serious criminal offense by rendering him competent to stand trial. Ruiz, however, like all others, "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Harper*, 494 U.S. at 221-22. The Supreme Court has resolved the conflicting interests by establishing "rare" circumstances under which the government will be permitted to administer antipsychotic drugs involuntarily. In *Sell*, 539 U.S. at 180, it set forth the four conditions that the government must satisfy in order to obtain an order authorizing it to involuntarily medicate a non-dangerous criminal defendant. A failure to meet any of the four is fatal to the government's request.

**[20]** Under *Sell*, an involuntary medication order by the district court cannot be issued unless the government proves 1) "that *important* governmental interests are at stake"; 2) "that involuntary medication will *significantly further* those concomitant state interests"; 3) "that involuntary medication

is *necessary* to further those interests"; and 4) "that administration of the drugs is *medically appropriate*." *Id.* at 180-81. The government has the burden of establishing the facts necessary to allow it to prevail on its request by clear and convincing evidence. Here, the government fell far short of meeting its burden with respect to at least two of the *Sell* factors. Because the district court clearly erred in finding that the government proved it met the second and fourth *Sell* factors by clear and convincing evidence, either of which failures in itself would require reversal, we reverse the district court's order authorizing involuntary medication.

**REVERSED**. This court's emergency stay order is **VACATED**.