Filed 10/18/13  P. v. Sargsyan CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

---

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

---

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HAYK SARGSYAN,<br><br>    Defendant and Appellant. | H039261<br>(Santa Clara County<br>Super. Ct. No. C1233596) |

Defendant Hayk Sargsyan appeals from an order authorizing involuntary administration of antipsychotic medication to him.  (Pen. Code, § 1370, subd. (a)(2).)[1] He contends that there was insufficient evidence to support the finding that he lacked the capacity to consent to this treatment.  We find no error and affirm.

## I.  Statement of the Case

On May 31, 2012, a felony complaint charged defendant with vandalism (§ 594, subds. (a), (b)(1)).  About a week later, there were concerns about defendant's mental competency and criminal proceedings were suspended.  (§ 1368.)  In September 2012, the trial court found that defendant was incompetent to stand trial based on a psychological evaluation.

---

[1]    All further statutory references are to the Penal Code.

After an evidentiary hearing on December 5, 2012, the trial court found that defendant did not have the capacity to consent to treatment with antipsychotic medication, committed him to the Department of State Hospitals, and authorized involuntary medication with antipsychotic drugs.

Defendant has filed a timely notice of appeal.

## II. Statement of Facts

On May 29, 2012, defendant threw a chair through the window that separated the staff work area from the assembly room at the Barbara Aaron's Psychiatric Facility. Defendant told the arresting officer that he was "pissed off" about an attendant's behavior.

## III. Discussion

Defendant contends that there was insufficient evidence to support the trial court's finding that he did not have the capacity to consent to treatment with antipsychotic medications.

### A. Background

After concerns were raised about defendant's competency in June 2012, the trial court suspended criminal proceedings and appointed Dr. Rudolph Cook, a psychologist, to evaluate defendant pursuant to section 1369, subdivision (a). Dr. Cook reviewed defendant's medical records. Defendant had a history of substance abuse and had been diagnosed with psychosis, not otherwise specified. A progress note, dated June 7, 2012, stated that defendant had been prescribed Depakote, Zyprexa, Thorazine, and Propanol, but he was refusing some of these medications "at times." The note also gave a description of defendant as "[u]ncooperative, unpredictable, not much interaction . . . [g]rossly disabled, unable to provide his own food, shelter and clothing." A week later, a progress note stated that defendant was "unresponsive, preoccupied with internal

2

stimuli," and refused psychiatric medication. Subsequent progress notes reported that defendant refused treatment, was unresponsive, uncooperative, agitated, and internally preoccupied, and exhibited bizarre and oppositional behavior. The progress note, dated July 3, 2012, also stated that defendant was "medically non-compliant. Responds to strong encouragement to take meds. A little improvement."

Dr. Cook attempted to interview defendant in jail on June 30, 2012, but he was informed that defendant was "mentally unstable and unable to come to an interview." Three days later, Dr. Cook spoke with defendant through his cell door. Defendant "communicated with [him] minimally and barely." Dr. Cook was "unable to understand anything" that defendant said to him. Dr. Cook stated: "I was unable to discern if he was responding to my direct questions, or if he was answering his own inner preoccupations. . . . I concluded the interview without having been able to elicit any form of emotional response from him, or engage him in any meaningful manner." Dr. Cook found "no meaningful improvement in the defendant's thinking and behavior since his arrest" and that "[i]f [defendant's] mental state was mainly due to substance abuse [Dr. Cook] would have expected to see more in the way of improvement in his mental state."

Based on his interview with defendant and his review of the medical records, Dr. Cook concluded that defendant was: "1) Unable to understand the nature of the proceedings in which he is currently engaged, [¶] and [¶] 2) Unable to cooperate with counsel in the development of a rational defense."

On September 5, 2012, after considering Dr. Cook's report, the trial court found defendant incompetent to stand trial and referred him to the South Bay Conditional Release Program for placement (CONREP). Two weeks later, Dr. Douglas Johnson, the community program director of (CONREP), filed a report in which he recommended that defendant be committed to the Department of State Hospitals for placement in a trial competency program. Staff had reported to Dr. Johnson that defendant had been

3

"floridly psychotic, responding to internal stimuli, paranoid and disorganized . . . despite him being medicated with two anti-psychotic and one mood stabilizer medication." Dr. Johnson interviewed defendant, who "spoke briefly but not on topic." According to Dr. Johnson, "[i]t was clear his psychotic [condition] was interfering with his ability to communicate effectively."

On September 19, 2012, the trial court appointed Dr. John Chamberlain, a board-certified psychiatrist and an associate professor of psychiatry at University of California at San Francisco, to evaluate defendant's competency to consent to treatment with antipsychotic medication. About a month later, Dr. Chamberlain filed his report.

At the December 5, 2012 hearing held on defendant's capacity to give his consent, Dr. Chamberlain testified as an expert in the diagnosis and treatment of mental disorders, including the prescription of antipsychotic and other psychotropic medications, and in assessing an individual's risk to themselves or others. Dr. Chamberlain met with defendant at the jail on October 7, 2012. Dr. Chamberlain explained to defendant who he was, why he was there, who ordered and would receive the evaluation, and the nature and purpose of the evaluation. He also explained that he was not there in a treating capacity, the limits of confidentiality, and that defendant's participation was voluntary. Defendant indicated that he understood the information and he did not have any questions. After asking defendant a few questions, Dr. Chamberlain concluded that he did not have an adequate understanding of what had been explained to him. Defendant said that Dr. Chamberlain had not told him what type of doctor he was, that no one told Dr. Chamberlain to evaluate him, and that he did not know the purpose of the evaluation or to whom the evaluation would be given. When Dr. Chamberlain asked defendant a question, it would take longer than expected for him to answer it. Dr. Chamberlain explained the informed consent advisement again. He also questioned him again about his understanding of the advisement, but defendant failed to demonstrate an

4

understanding. Dr. Chamberlain then ended their meeting. The meeting lasted about 16 minutes.

Dr. Chamberlain reviewed court records, including a felony complaint, documentation from the sheriff's office, the CLET printout, and Dr. Cook's report. Based on this information and his meeting with defendant, Dr. Cook concluded that defendant met the diagnostic criteria for a psychotic disorder, not otherwise specified. He explained that this disorder is characterized by symptoms of psychosis, such as delusions, hallucinations, and a disorganized pattern of thinking or disorganized behavior, but there is insufficient evidence to conclude that the person has a more specifically defined psychotic disorder such as schizophrenia.

Dr. Chamberlain opined that defendant was at increased risk of harming himself or committing violence without the treatment of antipsychotic medication. He also noted that Dr. Cook's report referred to defendant's history of substance use, but he concluded that defendant's custody for a "fairly long period" ruled it out as a cause of defendant's disorder.

Dr. Chamberlain would recommend that defendant begin treatment with Abilify or Risperdal, because these medications have fewer motor side effects, such as tardive dyskinesia in which the individual develops abnormal involuntary movements. However, the risks from these medications include metabolic side effects, including weight gain, increased blood sugar, diabetes, and elevated triglycerides and cholesterol. According to Dr. Chamberlain, Risperdal is "a little bit more likely" to cause metabolic side effects and slightly more sedating than Abilify. Neither medication has "much abuse potential." Another side effect of antipsychotic medication is akathisia, in which the person feels "very restless" and "as though their muscles are crawling under their skin, and they literally can't sit still. They will pace back and forth." According to Dr. Chamberlain, this side effect is not dangerous and is relatively easy to treat. Dr. Chamberlain noted

5

that defendant's medical records indicated that he had previously been prescribed Thorazine, Zyprexa, Depakote, and Propranolol.

Dr. Chamberlain opined that antipsychotic medication was an appropriate treatment for defendant's mental disorder and that other treatments were unlikely to be effective in treating his symptoms. He also opined that if defendant's mental disorder was not treated with antipsychotic medication, it was probable that serious harm to his physical or mental health would result. In Dr. Chamberlain's opinion, defendant lacked the capacity to make decisions regarding antipsychotic medication due to his problems with information processing. He explained: "That having gone over something relatively simple such as the nature and purpose of my being there and the evaluation twice, that he didn't seem to be able to demonstrate an adequate ability to master that material. . . . I don't think he would have the ability to engage in a discussion of something much more complex, which would be various treatment options available to him, the risks and benefits of different treatment options, and to engage in a rational discussion of those things."

According to Dr. Chamberlain, the side effects of the antipsychotic medication were unlikely to interfere with defendant's ability to understand the nature of the criminal proceedings or his ability to assist counsel in the conduct of his defense. He explained that the benefits of helping defendant think more clearly and process information would outweigh any risks of the medication and the treating clinician could adjust the medication to further minimize any adverse effects. In his view, it was medically appropriate to administer psychotropic medication to defendant. Dr. Chamberlain did not discuss with defendant about his willingness to take medication in the past or if he was currently willing to do so.

Dr. Chamberlain's knowledge of the medications prescribed for defendant was based on Dr. Cook's report. He had not reviewed which medications were effective because he was not defendant's treating psychiatrist. When he met with defendant, he

did not know whether he had actually taken his medication that day because he was unable to talk with him.

## B.  Burden of Proof and Standard of Review

In order to obtain a court order authorizing the involuntary administration of antipsychotic medication, the prosecution has the burden of proving by clear and convincing evidence that the defendant lacks the capacity to give his or her consent to such treatment.  (See *United States v. Ruiz-Gaxiola* (9th Cir. 2010) 623 F.3d 684, 692.)

An appellate court reviews the trial court's order authorizing the state hospital to administer antipsychotic medication involuntarily for substantial evidence.  (*People v. O'Dell* (2005) 126 Cal.App.4th 562, 570.)  Under this standard, an appellate court reviews "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value . . . ."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578 (*Johnson*).)

## C.  Sufficiency of the Evidence

A trial court has three distinct avenues for authorizing the involuntary administration of antipsychotic medication.  (§ 1370, subd. (a)(2)(B)(i).)  Here, the trial court focused on subsection (I) of section 1370, subdivision (a)(2)(B)(i), which has three requirements:  (1) "[t]he defendant lacks capacity to make decisions regarding antipsychotic medication," (2) "the defendant's mental disorder requires medical treatment with antipsychotic medication," and (3) "if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result."  (§ 1370, subd. (a)(2)(B)(i)(I).)

In the present case, there was substantial evidence to support the first requirement that defendant lacked the capacity to make decisions regarding antipsychotic medication. Defendant was diagnosed with psychosis, not otherwise specified, which impaired his

ability to communicate and process information. Drs. Cook, Johnson, and Chamberlain were unable to engage in any meaningful conversation with defendant. Dr. Cook was "unable to discern if [defendant] was responding to [his] direct questions, or if he was answering his own inner preoccupations." When defendant spoke with Dr. Johnson, he was also not responsive. In Dr. Chamberlain's view, defendant lacked the capacity to make decisions regarding antipsychotic medication because he was unable to demonstrate an ability to engage in a discussion of a less complex topic, that is, the nature and purpose of Dr. Chamberlain's visit.

There was also substantial evidence to support the second requirement that defendant's mental disorder required treatment with antipsychotic medication. As previously stated, defendant was diagnosed as psychotic. Substance abuse was eliminated as a cause of his condition because his symptoms persisted after he had been arrested. In Dr. Chamberlain's opinion, defendant's symptoms were appropriately treated with antipsychotic medication and other treatments were unlikely to be effective. Dr. Chamberlain also discussed the benefits of antipsychotic medications and how any side effects of such treatment could be mitigated.

The trial court must also find that serious harm to defendant's mental or physical health would probably result if defendant was not treated with antipsychotic medication. "Probability of serious harm to the physical or mental health of the defendant requires evidence that the defendant is presently suffering adverse effects to his or her physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and his or her condition is substantially deteriorating. The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant." (§ 1370, subd. (a)(2)(B)(i)(I).) Here, defendant's medical records included several incidents in which his mental illness had interfered with his ability to think, communicate, and control his anger, thereby constituting evidence that he had previously suffered adverse effects to

8

his mental health. Defendant was unable to communicate with Drs. Cook, Johnson, and Chamberlain. He was also uncooperative, unpredictable, and preoccupied with internal stimuli, engaged in bizarre behavior, and swung a chair through a window at a treatment facility. Dr. Chamberlain explained the need for treatment for defendant: "[P]sychosis [is] a toxic condition to the brain. The longer someone is in a psychotic state and untreated, the more difficult to treat, the more resistant to treatment. Their symptoms tend to . . . progress and worsen over time and their social interpersonal occupational functioning tends to decline over time the longer they stay psychotic." He also testified that people who have been diagnosed as psychotic have more physical health problems, including higher rates of obesity and diabetes, high blood pressure, and higher rates of substance abuse. Thus, there was substantial evidence to support the finding that serious harm to defendant's mental health would probably result if defendant was not treated with antipsychotic medication.

Defendant argues, however, "it is highly doubtful that a determination that the presumption [he] had the required capacity had been overridden can be supported by 16 minute interview where the examiner did not even ask [him] if he would consent to taking antipsychotic medication. He did not discuss the underlying offense with [him]. All he did was to give his informed consent advisement." There is no merit to this argument. This court reviews the entire record for substantial evidence and draws all inferences in favor of the trial court's ruling. (*Johnson*, *supra*, 26 Cal.3d at p. 578.) Dr. Chamberlain's report and testimony were based on his review of the felony complaint, documentation from the sheriff's office, and Dr. Cook's report, which included a discussion of defendant's medical records, as well as his interview with defendant. During Dr. Chamberlain's interview with defendant, he attempted to give the informed consent advisements twice. However, defendant's failure to demonstrate that he understood these advisements supported Dr. Chamberlain's conclusion that defendant

was incapable of engaging in a rational discussion regarding the more complex subject of treatment with antipsychotic medication.

Defendant also contends that Dr. Chamberlain did not review defendant's medical records to determine if any medical considerations applied. However, Dr. Chamberlain testified that he had reviewed Dr. Cook's report, which had not indicated that defendant had a medical condition which would explain his psychosis. Defendant next points out that there was no evidence that Dr. Chamberlain had reviewed Dr. Johnson's report which stated that defendant was "medicated with two anti-psychotic and one mood stabilizer medication[s]" less than a month before his interview with Dr. Chamberlain. But since Dr. Cook's report indicated that defendant sometimes took his medications, Dr. Chamberlain was aware of this fact. The trial court could have then reasonably concluded that defendant's intermittent use of medications was inadequate to treat his symptoms.

In sum, there was substantial evidence to support the trial court's order.

## IV. Disposition

The order is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.

11