**PUBLIC COPY – SEALED INFORMATION DELETED**

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 6, 2019        Decided October 4, 2019

No. 18-3082

UNITED STATES OF AMERICA,
APPELLEE

v.

JEAN-PAUL GAMARRA,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cr-00065-1)

———

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Tony Axam Jr.* and *David W. Bos*, Assistant Federal Public Defenders, entered appearances.

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman*, and *Chrisellen R. Kolb*, Assistant U.S. Attorneys.

**PUBLIC COPY – SEALED INFORMATION DELETED**

Before: ROGERS and PILLARD, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Concurring opinion filed by *Circuit Judge* PILLARD.[1]

RANDOLPH, *Senior Circuit Judge*:  This is a criminal case. The defendant, Jean-Paul Gamarra, appeals from an order of the district court.  The order authorized the government to medicate him without his consent for the purpose of rendering him competent to stand trial.

Questions about Gamarra's soundness of mind arose from these largely undisputed circumstances of his arrest on March 28, 2017. Gamarra approached a Secret Service Agent stationed near the Treasury Department Building, adjacent to the White House.  Gamarra told the Agent that he had a package containing a "nuclear bomb detonator or defuser."  The Agent ordered Gamarra to place his package on the ground.  On the package were messages: "Warning this is a ~~tre~~ threat on the President and Senator life Secure Keyboard to be Reversed Engineered," and "Warning 100% threat Brand New Electronic Detonator Device president Secrete Servisce Explosive technology Department."  On the package's label was this: "Blue tooth Bomb Explosion Component."

In response, the Agent arrested Gamarra while other law enforcement officers closed the surrounding areas to pedestrian and vehicular traffic for an hour and a half.  When officers

---

[1] **NOTE:** Portions of the concurring opinion contain **Sealed Information**, which has been redacted.

PUBLIC COPY – SEALED INFORMATION DELETED

examined Gamarra's package they found only an ordinary Bluetooth keyboard.

A grand jury indicted Gamarra for threatening bodily harm to the President (18 U.S.C. § 871) and for conveying false information concerning the use of an explosive (18 U.S.C. § 844(e)).

Gamarra's actions raised doubts about whether he was competent to stand trial. On the government's motion, the magistrate judge ordered Gamarra committed to custody for the purpose of evaluating his competency. A forensic psychologist examined Gamarra and concluded that he suffered from a 'schizoaffective disorder' and that he was not competent to stand trial. After a hearing, the Magistrate Judge agreed and issued an order under 18 U.S.C. § 4241(d) committing Gamarra to continuing custody for the purpose of determining whether he could become competent. This subsection provides, in part:

> The Attorney General shall hospitalize the defendant for treatment in a suitable facility . . . for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward[.]

After some delay, Gamarra was transferred to the Federal Medical Center, Butner, North Carolina. A psychology intern at Butner and her supervisor, a forensic psychologist, attended to Gamarra and signed a report. From multiple clinical evaluations, interviews and observations, they concluded that Gamarra suffered from delusional thinking and disorganized speech. His medical history and the accounts of his family

PUBLIC COPY – SEALED INFORMATION DELETED

members indicated that he could not become competent without anti-psychotic medicine. At Butner, Gamarra started taking the prescribed medication, but within a short time became noncompliant.

The government therefore moved for an order authorizing involuntary medication. After a three-day evidentiary hearing, the Magistrate Judge recommended denying the motion on the ground that the government failed to provide treatment to Gamarra within the four month period specified in 18 U.S.C. § 4241(d)(2). The district court rejected the recommendation and granted the government's motion, concluding that under *Sell v. United States*, 539 U.S. 166 (2003), "the government had met its burden of proof with respect to each of the four *Sell* factors." *United States v. Gamarra*, 2018 WL 5257846, *9 (D.D.C. 2018).

Gamarra's appeal is limited to the district court's rulings on two of the four *Sell* factors – the second and the fourth. The second *Sell* factor requires the government to establish that "the administration of the drugs is substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181. The fourth *Sell* factor requires the government to establish that "administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition." *Id.*

The district court's conclusions in favor of the government must rest on "clear and convincing evidence." *United States v. Dillon*, 738 F.3d 284, 291 (D.C. Cir. 2013). Our review of those conclusions is for "clear error." *Id.* Under this standard, we

5

may reverse only "if (1) the findings are 'without substantial evidentiary support or … induced by an erroneous application of the law'; or if (2) 'on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *Id.* at 297 (quoting *Cuddy v. Carmen*, 762 F.2d 119, 124 (D.C. Cir. 1985)).

Gamarra's objections to the district court's assessment of the second *Sell* factor are that the court should not have relied on the opinion of Butner's head psychiatrist – Logan Graddy, M.D. – because Dr. Graddy did not personally examine Gamarra, and because he ignored Gamarra's recollection and his medical records regarding the side effects he experienced when he took anti-psychotic medications in the past.

Although Dr. Graddy acknowledged that it was "unusual" and "unfortunate" that he was offering an opinion without a personal examination, Gamarra has failed to identify how the lack of a personal examination compromised Dr. Graddy's conclusion that the second *Sell* factor was satisfied. Moreover, courts have relied on experts who reached their opinions based on a review of a patient's medical records and other information without personally conducting an examination. *See Jones v. Sec'y, Fla. Dep't Of Corr.*, 834 F.3d 1299, 1315–16 (11th Cir. 2016) (collecting cases in which courts relied on a medical expert who had not personally examined the patient). As the district court noted, an opinion of the American Psychiatric Association's Ethics Committee then in effect concluded that it was both ethical and common for a "'forensic expert to offer opinions' based on review of records and without examining the defendant in person." *Gamarra*, 2018 WL 5257846 at *10 (quoting American Psychiatric Ass'n, *Opinions of the Ethics Committee on The Principles of Medical Ethics* 35 (2017), available at https://www.psychiatry.org/psychiatrists/practice/

**PUBLIC COPY – SEALED INFORMATION DELETED**

ethics).  The government's burden here was higher than under the common preponderance of evidence standard.  But Gamarra has identified no countervailing authority connecting the lack of personal examination with a failure to meet that burden.

The district court also did not clearly err in concluding that the prescribed medication was substantially unlikely to cause side effects impairing Gamarra's ability to assist his counsel.  Dr. Graddy reviewed Gamarra's medical history, including medical records of Gamarra's previous experiences taking anti-psychotic medication.  Dr. Graddy based his judgment on those records, on his clinical experience, and on his review of the medical literature regarding the effects of anti-psychotic medication.  Gamarra argues that Dr. Graddy's conclusion affords insufficient weight to Gamarra's experiences in taking anti-psychotic medication.  Dr. Graddy acknowledged the side effects and explained how they would be managed if they recurred.  The District Court did not clearly err in crediting Dr. Graddy's opinion.  We assume that Gamarra will be returned to FMC Butner and that, as Dr. Graddy testified, the medical personnel at that facility will adjust Gamarra's medication to minimize side effects.  Were side effects to require attention while Gamarra is in the District of Columbia awaiting trial or during trial, the district court should ensure appropriate medical personnel will promptly respond.

Accordingly, the district court did not commit any clear error regarding the second *Sell* factor.

Gamarra's arguments regarding the fourth *Sell* factor overlap with his arguments regarding the second *Sell* factor.  We are again told that the district court should not have credited Dr. Graddy's opinion on medical appropriateness because he did not interview Gamarra.  Once again, Gamarra has failed to identify

**PUBLIC COPY – SEALED INFORMATION DELETED**

how the district court clearly erred in relying on Dr. Graddy's testimony to determine that the government satisfied the fourth *Sell* factor. The fact that Dr. Graddy did not personally examine Gamarra does not detract from his finding that Gamarra's symptoms would be ameliorated through medication. Dr. Graddy understood Gamarra's condition from his review of the medical records and reports of forensic psychologists who interacted with Gamarra. We therefore believe Gamarra has presented no basis for concluding that the district court clearly erred in relying on Dr. Graddy to conclude that involuntary medication would be in Gamarra's best medical interests.

For the reasons stated above, the district court's order authorizing involuntary medication is

*Affirmed.*

PILLARD, *Circuit Judge*, concurring:[1]   A district court order authorizing the forcible medication of an incompetent defendant has serious consequences, implicating the defendant's "significant constitutionally protected liberty interest in avoiding the unwanted administration of anti-psychotic drugs." *Sell v. United States*, 539 U.S. 166, 178 (2003) (internal quotation marks omitted) (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)).  Medication "changes one's mental state—one's very thought processes—and in a way that can't be resisted by any effort."  Elyn R. Saks, *Refusing Care:  Forced Treatment and the Rights of the Mentally Ill* 87 (2002).  State-imposed medication raises the stakes even further, conjuring up plots of dystopian science fiction.

The Supreme Court has held that forced medication to render a defendant competent for trial is intended to be "rare," appropriate only when the four specified "*Sell*" factors are satisfied.  *Sell*, 539 U.S. at 180.  These factors permit forcible medication only where (1) "*important* governmental interests are at stake"; (2) "involuntary medication will *significantly further* those concomitant state interests" by administration of drugs "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense"; (3) "involuntary medication is *necessary* to further [state] interests"; and (4) "administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 180-81.  In the aftermath of *Sell*, lower courts have further acknowledged the gravity of this step by requiring the government to demonstrate that the *Sell* factors

---

[1] **NOTE:**   Portions of this opinion contain **Sealed Information**.

**PUBLIC COPY – SEALED INFORMATION DELETED**

are met by clear and convincing evidence. *See, e.g.*, *United States v. Dillon*, 738 F.3d 284, 291-92 (D.C. Cir. 2013) (collecting cases).

The government must exercise exacting diligence to meet its burden. The grave risks involuntary psychotropic medication pose to a person's liberty and autonomy—his say over what is done to his own brain—call for heightened attention. This is especially so given the broader context in which forcible medication may occur. Not only does the government control whether to initiate prosecution against incompetent defendants, it oversees the medical personnel in federal facilities who observe such defendants and, where warranted, treats them, and it determines in the first instance whether such defendants have been rendered competent for trial. As a result, the government almost always has superior expertise and access to information than does defense counsel or the courts. Defense counsel, for their part, face extra challenges posed by the imperative to mount the most powerful and comprehensive defense while guided by the wishes of a client who, even though not competent for trial, retains legal authority to direct his representation. These unusual background conditions strain our adversary system.

This case illustrates these complexities and raises questions about whether the government has met its burden under the demanding *Sell* standard. The government seeks to medicate Gamarra against his will based almost exclusively on the report and testimony of a single psychiatrist, Dr. Graddy, without requiring or outlining any specifics regarding the dosage and timeframe of the envisioned course of treatment, in a context where Gamarra has already spent longer in detention than he will for any sentence he is likely to receive. By the time of the *Sell* hearing, Gamarra had been detained for seven

**PUBLIC COPY – SEALED INFORMATION DELETED**

months, but Dr. Graddy had not met with him, and it does not appear that any psychiatrist or other health care provider sought to establish a consistent therapeutic relationship with him. The record is thin—quite frankly, thinner than it should be—as to the current importance of the government's interest in this prosecution, the details and rationales of the planned treatment, the extent to which voluntary compliance was meaningfully sought as a less restrictive means, and whether the specific drug chosen is the best one.

Most of the questions these circumstances evoke were not raised on appeal. And our review is for clear error. The standard of review reflects the institutional advantage of district courts' first-hand evaluation of factual circumstances—an advantage especially significant in the context of highly contextual decisions regarding psychiatric intervention. I therefore join the panel opinion. Nonetheless, because approving the forcible administration of medication here without additional comment threatens "the sensitive balancing required by *Sell* in light of the significant liberty interests implicated by forcible medication," *id.* at 296, I write separately to highlight benchmarks we expect the government to meet when requesting approval for forcible medication going forward, with the hope that these benchmarks provide useful guidance to district courts evaluating such motions in future cases.

## I.

The government must show by clear and convincing evidence that it has a continuing, important interest in forcibly medicating an incompetent defendant. *Sell*, 539 U.S. at 180. Satisfying that first *Sell* factor requires the government to provide affirmative answers to "two distinct questions": First,

4

"whether the charged crime is 'serious,' because the Government's interest in a prosecution generally qualifies as 'important' when the defendant is charged with a serious crime"; and, second, whether no "'[s]pecial circumstances . . . lessen the importance of that interest.'" *Dillon*, 738 F.3d at 292 (quoting *Sell*, 539 U.S. at 180). The government's ordinarily strong interest in prosecuting serious crimes may be offset where there are countervailing considerations, such as "the prospect of lengthy civil commitment" or "an extended period of pretrial detention." *Id.*; *see also Sell*, 539 U.S. at 180.

Subjecting a defendant to an extended period of pretrial detention may lessen the government's penal interest to the point that it no longer justifies forcibly medicating the defendant. Gamarra has been in detention on these charges since March 28, 2017. *See* Gamarra Rule 28(j) Letter (filed 9/6/19). The government calculated Gamarra's likely Guidelines range, in the event that he is convicted of the charges against him, to be from 21 to 27 months in prison. J.A. 100. We have yet to decide this issue, but other circuits, faced with charged crimes they treat as "serious," compare the recommended Guidelines range that the defendant is likely to face if convicted to the amount of time the defendant has already spent in custody. *See, e.g.*, *United States v. Berry*, 911 F.3d 354, 362-63 (6th Cir. 2018); *United States v. Grigsby*, 712 F.3d 964, 973-74 (6th Cir. 2013); *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 694 (9th Cir. 2010); *United States v. White*, 620 F.3d 401, 413-19 (4th Cir. 2010). They do so because the Bureau of Prisons is required to credit pre-trial detention toward any term of imprisonment imposed, *see* 18 U.S.C. § 3585(b)(1), and because "[w]here a defendant has already served sufficient time that a guilty verdict will result only in a sentence of time served, the deterrent effect of imprisonment has evaporated," *Berry*, 911 F.3d at 363. The

5

government has already detained Gamarra for longer than the recommended Guidelines range. It will need to detain him for several more weeks to medicate him and bring him to trial. Whatever specific deterrent effect a post-conviction term of imprisonment is supposed to have on the defendant, section 3585(b)(1) tells us, will be effectively achieved by that time.

Governmental interests in criminal prosecution extend beyond incapacitation and deterrence of the particular defendant. *Sell*, 539 U.S. at 186; *Dillon*, 738 F.3d at 296. They include the "significance for society" of a prosecution, including achieving general deterrence. *United States v. Onuoha*, 820 F.3d 1049, 1056 (9th Cir. 2016); *see also United States v. Gutierrez*, 704 F.3d 442, 451 (5th Cir. 2013). The government may also pursue a prosecution to secure a term of supervised release with specified conditions that follow incarceration. *See Onuoha*, 820 F.3d at 1056; *United States v. Mackey*, 717 F.3d 569, 575 (8th Cir. 2013); *Gutierrez*, 704 F.3d at 451. The law places a burden on the government up to the time of forcible administration of psychotropic medication to have a current, important interest in prosecuting the defendant that suffices to justify that grave intrusion. The government has not explained in any but the most general terms how these interests are promoted by the prosecution of Gamarra. We do not, however, resolve the issue here because Gamarra has failed to appeal the district court's conclusion that the first *Sell* factor has been satisfied.

## II.

The government may forcibly medicate a defendant only where no treatment short of forced medication would render the defendant competent to stand trial, such that "involuntary medication is *necessary* to further" the government's interest

6

PUBLIC COPY – SEALED INFORMATION DELETED

in prosecution.  *Sell*, 539 U.S. at 181.  In other words, a court cannot approve involuntary administration of psychotropic medication unless the government produces clear and convincing evidence that any "alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.*  Of particular import is whether medical staff have adequately attempted to encourage the patient's voluntary compliance with a medication regimen before they resort to administering medication by force.

Here, too, Gamarra fails to make any argument on appeal. Indeed, with the government focused on obtaining authorization to administer medication even over Gamarra's objections, and Gamarra insisting that *no* medication is necessary to render him competent, neither party fully explored what would appear to be critical terrain:  Which treatment regimen is most likely to achieve the best results in pursuit of the public interest with the least intrusion on the defendant's fundamental rights.  The record convincingly supports the conclusion that medication is an essential ingredient to restoration of Gamarra's competence.  But that is hardly the end of the medical or legal story.

The record does not paint a clear picture as to how or whether the government considered medically informed measures to enhance the prospect of voluntary compliance. Nor does it explain in any detail any measures to minimize Gamarra's risk of side effects—let alone any measure that might limit or ameliorate the trauma associated with involuntary administration.  Any psychiatrist, Dr. Graddy included, would agree that the prospects for voluntary compliance with a course of psychotropic medication depends on establishing a consistent therapeutic relationship.  Indeed, Dr. Graddy testified that he believed "therapy plus medications

**PUBLIC COPY – SEALED INFORMATION DELETED**

is the best treatment for pretty much any psychiatric problem." *See* 4/13/18 Hr'g Tr. at 119. Yet, remarkably, it appears from the record that no psychiatrist had seen Gamarra in person, and that no therapist of any sort had established a therapeutic relationship with Gamarra or treated him on a regular basis during the time from September 2017 to April 2018 that he had been detained pursuant to a court order to "hospitalize the defendant for treatment in a suitable facility." 18 U.S.C. § 4241(d).[2]

The magistrate judge's order authorizing commitment at Butner stated, in accordance with 18 U.S.C. § 4241(d)(1), that the purpose of confinement was "to determine whether there is a substantial probability that in the foreseeable future [Gamarra] will attain the capacity to permit the proceedings to go forward." J.A. 31. Gamarra arrived at Butner in September 2017 and was confined there for seven months prior to his *Sell* hearing. During that period, Dr. Graddy could not recall a single in-person meeting with Gamarra, stating only that "I may have seen him around. I don't know. I looked at his picture. I'm not sure honestly." 4/13/18 Hr'g Tr. at 135. Dr. Graddy points to the fact that he "received updates" from Dr. Laura Enman, a clinical pharmacist, *id.* at 112, but she appears only to have dispensed medication when Gamarra asked for it, and was not in a position to support compliance even with that limited treatment regimen. A staff psychologist, Dr. DuBois, saw Gamarra 5-7 times, and a graduate student intern, Ms.

---

[2] Whatever the situation when Dr. Graddy testified, it appears that current ethical guidelines would not support testimony by a psychiatrist who did not make reasonable efforts to examine the patient in person. *See* American Psychiatric Ass'n, *Opinions of the Ethics Committee on The Principles of Medical Ethics* 25 (2019), available at https://www.psychiatry.org/psychiatrists/practice/ethics.

8

Laxton, saw Gamarra 13-15 times before completing their report in January 2018. But it appears that their primary purpose was to observe him for purposes of writing their report, in which context they occasionally challenged some of his delusional beliefs; the record does not cast them in a therapeutic role. Dr. Graddy confirmed at the *Sell* hearing that "no one who was supervising Mr. Gamarra from a psychiatric standpoint" between October 2017 and April 2018 "had a medical degree." 4/13/18 Hr'g Tr. at 138. Apart from recounting those contacts, the record says nothing about what individual therapeutic attention, if any, Gamarra received at Butner.

Under these circumstances, I am skeptical that the record contains clear and convincing evidence that no treatment short of forcible medication could have rendered Gamarra competent for trial. Indeed, the magistrate judge in this case recommended that the government's *Sell* motion be denied precisely because she was uncertain whether Gamarra had received treatment at all. J.A. 153-57. Although she framed this question as preliminary to the *Sell* inquiry as a whole, her concern also goes to whether the government has met its burden under the third *Sell* factor. Of course, none of this is to question the basic premise on which all treating personnel agreed, namely, that some form of medication would be required to render Gamarra competent. The only issue here is whether the government met its burden of showing that garnering voluntary compliance, most likely in the context of an in-person therapeutic relationship, could not succeed. Revealingly, Dr. Graddy testified that only with a *Sell* order in hand would he embark on "hav[ing] a conversation with [Gamarra] about what medication he wanted to start," and that "with [Gamarra's] input, he could voluntarily decide at that point to take medication in conjunction with the court order."

4/13/18 Hr'g Tr. at 123. To decide in favor of involuntary medication in these circumstances puts the cart before the horse.

As noted above, Gamarra did not press this issue. In general, however, a court should approve a *Sell* order only where the government can demonstrate by clear and convincing evidence not only that psychotropic medication is needed, but also that medically appropriate efforts at voluntary compliance have been made and were not successful.

## III.

Finally, in evaluating whether forcible medication is warranted, district courts must also look beyond the immediate goal of gaining competency for trial to determine whether the particular treatment proposed to that end is in the defendant's best interest. Under the fourth *Sell* factor, courts must therefore "conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181. The "specific kinds of drugs at issue may matter here as elsewhere" because "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id.* This factor raises a series of issues that district courts should grapple with in resolving *Sell* motions.

First, the government's medical personnel should provide a specific treatment plan to serve as the basis of their analysis of the benefits and side effects of medication, and the court's review of that analysis. As the Tenth Circuit persuasively observes, "without knowing which drugs the government might administer and at what range of doses, a court cannot properly conclude that such a vague treatment plan is

**PUBLIC COPY – SEALED INFORMATION DELETED**

'medically appropriate.'" *United States v. Chavez*, 734 F.3d 1247, 1253 (10th Cir. 2013) (quoting *Sell*, 539 U.S. at 181).

Here, it is unclear what the Butner staff have in mind as Gamarra's treatment plan. Other than stating that ███ ████████████████████████████ Dr. Graddy provides no details about his plans for Gamarra. ██████████████ He identifies no specific starting dose, nor does he commit to a maximum dosage that Gamarra will receive. All we have to go on is the generic statement in the appendix that Butner provides in every *Sell* case, noting that ████████████████████████████████ ████████████████████████████████ ████████████ Dr. Graddy testified that he would monitor Gamarra and adjust his medication "immediately" in response to any side effects. 4/20/18 Hr'g Tr. at 41. He also claimed that he would "immediately" act to mitigate any side effects, perhaps by using beta blockers. *Id.* at 42, 46.

Faced with plans sketched at that level of generality, it is difficult to see how a court could make the medically informed determinations that the second and fourth *Sell* factors demand. How, for example, would Dr. Graddy modulate his treatment "immediately" if he has administered a long-acting form of risperidone that lasts several weeks? Indeed, other courts have been able to reach those conclusions only by reviewing detailed, recommended treatment plans medical personnel proffer for specific patients, and probing them with the aid of academic studies and medical testimony. *See, e.g.*, *Onuoha*, 820 F.3d at 1057-60; *United States v. Watson*, 793 F.3d 416, 424-27 (4th Cir. 2015); *Grigsby*, 712 F.3d at 975-76; *United States v. Evans*, 404 F.3d 227, 241 (4th Cir. 2005). It is unclear why the government did not provide a specific treatment plan here and how, without one, a district court can be expected to

**PUBLIC COPY – SEALED INFORMATION DELETED**

engage in the "sensitive balancing" that *Sell* contemplates. *Dillon*, 738 F.3d at 296.

Second, the government must demonstrate by clear and convincing evidence that the particular drug recommended is medically appropriate. As noted, *Sell* itself provides that the "specific kinds of drugs at issue" are a relevant consideration under this factor. *Sell*, 539 U.S. at 181. In this case, Dr. Graddy said that he would pursue a course of risperidone because Gamarra has responded well to it in the past. But Gamarra's medical records reveal an incident where he blacked out and was hospitalized after ingesting risperidone, with treating staff recording an unhealthily low blood pressure level. And Gamarra has consistently articulated an aversion to that particular drug. To be sure, his aversion was irrationally expressed. He said that ███████████████████████ ████████████████ asserted that ████████████ ████████████████████████████ But even an aversion entangled in delusional beliefs would seem to bear on a patient's level of compliance with the proposed medication regimen, as well as the likelihood that its administration will be unnecessarily traumatic for him.

Indeed, Dr. Graddy's own report suggests no reason to administer risperidone rather than another antipsychotic, especially one such as Seroquel that Gamarra actually favored. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████ Gamarra requested Seroquel when he arrived at FMC Butner, and he did at the outset demonstrate some compliance on it. The *Sell* Appendix asserts that ████████████████████████ ████████████████████████████████████████

**PUBLIC COPY – SEALED INFORMATION DELETED**

███████████████████████████████████ And, as applied to Gamarra himself, Dr. Graddy's report stated that

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████ Perhaps there are good medical reasons for Dr. Graddy's choice of risperidone, but those reasons are not apparent from the record.

Third, a court order granting a *Sell* motion should state meaningful limitations on what drugs and dosages a defendant may receive, and for how long attempts to restore a defendant's competence may continue. Other circuits have required that the "order to involuntarily medicate a non-dangerous defendant solely in order to render him competent to stand trial must specify which medications might be administered and their maximum dosages." *Chavez*, 734 F.3d at 1253; *see also United States v. Breedlove*, 756 F.3d 1036, 1043-44 (7th Cir. 2014); *United States v. Hernandez-Vasquez*, 513 F.3d 908, 916-17 (9th Cir. 2008); *United States v. Bush*, 585 F.3d 806, 817-18 (4th Cir. 2009); *Evans*, 404 F.3d at 240-42. By statute, once it has been determined that "there is a substantial probability that in the foreseeable future" a defendant may be rendered competent, the defendant may be detained only for "the time period specified." 18 U.S.C. § 4241(d)(1), (d)(2). Here, the district court order granting forcible medication required only that the "medical staff at FMC Butner submit a report detailing Gamarra's treatment (including the assessment and management of any side effects), and any further recommendations concerning future treatment within thirty (30) days of the commencement of Gamarra's involuntary medication, and then every thirty (30) days thereafter." J.A. 207. An open-ended order of this kind impermissibly grants the Butner staff "carte blanche" to treat Gamarra as they see fit.

13

*Breedlove*, 756 F.3d at 1044 (quoting *Evans*, 404 F.3d at 241). This is especially so since Dr. Graddy's "proposed individualized treatment plan" broadly authorizes him to ███████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ It is thus worth stressing that our judgment here does not prevent the district court from seeking any further information it may need as Gamarra's treatment proceeds to ensure that the treatment is carried out in a manner that is medically appropriate under *Sell*, and time-limited as required by section 4241(d)(2).

Courts cannot and need not micromanage the medication decisions of medical professionals. *Cf. Onuoha*, 820 F.3d at 1059; *Hernandez-Vasquez*, 513 F.3d at 917. The medical decisions can be made only by experts. But where the government seeks to medicate a defendant in order to prosecute him, it must persuade the court that the medical decisions are appropriate. In this context, it is not too much to ask that doctors propose, and district courts set, basic boundaries on permissible treatment, including the drug(s) to be administered, the maximum dosage, and the contemplated timeframe for treatment. Although Gamarra does not raise these considerations, other circuits have required such specificity for *Sell* orders within their jurisdiction, and I see no reason why we would not follow suit.

\* \* \*

In light of the serious liberty interest at stake in the forcible administration of psychotropic medication, the government must demonstrate, in each case by clear and convincing evidence, that it retains an important interest in the prosecution,

**PUBLIC COPY – SEALED INFORMATION DELETED**

that adequate efforts at voluntary compliance were attempted, and that medical staff have provided the court with a treatment plan with enough specificity to guide the court's *Sell* analysis. In turn, the court must guarantee that an appropriate drug has been prescribed and specify limits on what treatment the patient may receive and for how long. Because Gamarra does not raise these considerations on appeal, and in respect for the district court's superior vantage point, I join the opinion of the court. But I do so uneasily. I would not in future be inclined to rest on a trial-incompetent defendant's forfeiture of arguments to relieve the government of its burden to establish each of the *Sell* factors by clear and convincing evidence.